**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:

American Center for Civil Justice, Inc.,                Chapter 11

                                                        Case No. 18-15691 (CMG)

                        Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - -X

American Center for Civil Justice, Inc.,                Adv.Pro.No. 18-01273 (CMG)

            Plaintiff,

v.

Joshua Ambush,

            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

**BROEGE, NEUMANN, FISCHER & SHAVER**
**Timothy P. Neumann, Esq.**
Attorneys for Plaintiff

**McMANIMON SCOTLAND & BAUMANN, LLC**
**Andrea Dobin, Esq.**
Attorneys for Defendant

**CHRISTINE M. GRAVELLE, U.S.B.J.**

## INTRODUCTION

The American Center for Civil Justice, Inc. ("ACCJ"), a debtor in a Chapter 11 case

before the Court, brought this adversary proceeding seeking to expunge the proof of claim filed

in the bankruptcy by Joshua Ambush, Esq. ("Ambush") in the amount of $31,800,000.00 (the

"Claim").  The Claim arises out of alleged breaches of a settlement agreement between Ambush

and ACCJ signed in September 2012 (the "Settlement Agreement") and RICO violations.

The Court GRANTS ACCJ's motion for partial summary judgment, expunging the claim

filed by Ambush and DENIES Ambush's cross-motion.[1]

## JURISDICTION

The Court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and

157(a) and the Standing Order of the United States District Court dated July 10, 1984, as

amended October 17, 2013, referring all bankruptcy cases to the bankruptcy court.  This matter is

a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A) and (B).  Venue is proper in

this Court pursuant to 28 U.S.C. § 1408.  Pursuant to Fed. R. Bankr. P. 7052, the Court issues the

following findings of fact and conclusions of law.

## PROCEDURAL HISTORY

On March 23, 2018, ACCJ filed a petition for relief under Chapter 11 of the Bankruptcy

Code (the "Main Case").

On April 5, 2018, in the Main Case, Ambush filed proof of claim #2-1 in the amount of

$31,800,000.00 (the "Claim").   The Claim, at section 8, states that the basis for the Claim is

---

[1] As is discussed in the Procedural History herein, a group of three creditors filed a separate motion to modify the claim of Ambush In the main bankruptcy case.  As this decision also grants the request for relief made in the motion to modify the claim, the arguments made therein will not be separately addressed.

"Breach of Contract/RICO/damages/fees/costs/int."  The Claim attaches five (5) exhibits.
Exhibit A is a copy of a filed complaint in a pending civil action in the United States District
Court for the District of Columbia filed by Ambush against ACCJ and others in 2015 (the "2015
Action").  The 2015 Action alleges violations of the Settlement Agreement that are the subject of
this decision.  Exhibit B is a copy of the Settlement Agreement.  Exhibits C, D, and E are
documents from the 2015 Action.

On June 12, 2018, ACCJ filed the present adversary proceeding against Ambush,
objecting to his claim and making a counterclaim against Ambush for an alleged breach of the
Settlement Agreement.

On November 4, 2018, in the Main Case, ACCJ filed a Motion to Estimate Ambush's
Claim at Zero for Purposes of Voting and Confirmation.  Ambush objected to the motion and
this Court ultimately ordered the Claim to be estimated at $3,626,212.80.  The figure was based
upon six (6) specifically identified alleged breaches of the Settlement Agreement.

On February 21, 2019, ACCJ filed its first Motion for Partial Summary Judgment against
Ambush in the adversary proceeding.  The motion sought to limit the Claim to no more than the
$3,626,212.80 figure from the estimation motion for all purposes.  Ambush objected to the
motion on the basis that discovery was appropriate before judgment could be entered fixing the
amount of his claim.

Additionally, one week after ACCJ filed the Motion for Partial Summary Judgment in
this adversary proceeding, Diana Campuzano, Avi Elishis, and Gregg Salzman (the "Campuzano
Claimants") filed an objection to the Claim by way of motion in the Main Case.  The Campuzano
Claimants took the position, in part, that the Settlement Agreement only provides for total
damages of $600,000, and not $600,000 per breach, as Ambush seeks.

On April 3, 2019, ACCJ filed a second Motion for Partial Summary Judgment against Ambush in the adversary proceeding. This second motion sought a finding that the six specifically identified alleged breaches of the Settlement Agreement should be limited to no more than three (3) violations.  On May 17, 2019, Ambush filed a Cross-Motion for Partial Summary Judgment as to two (2) of the alleged breaches.

The Court has held numerous settlement conferences, discovery conferences, and on the record hearings on these matters.  Ultimately, the issues were adjourned from June to December to allow for full discovery to progress.  The parties submitted supplemental filings and appeared for oral argument in January 2020.  Because discovery has now closed, ACCJ and Ambush now ask for summary judgment as to all issues, rather than the partial nature of the relief requested in the motion filings.  The parties indicated that they do not believe live testimony in addition to the depositions submitted with the supplemental filings will be beneficial.  The Court has been charged with determining credibility using deposition transcripts and certifications, in addition to reviewing documentary evidence.

## FACTS

ACCJ is a non-profit organization which locates victims of state-sponsored terrorism and their families (collectively, the "Victims"), and pursues claims on their behalf for civil damages against governments and their agents that have perpetrated or aided and abetted terrorism.  The relationship between ACCJ and the Victims is memorialized in a Claimant-Center Agreement (the "Claimant Agreement") whereby ACCJ retains counsel at its own expense to pursue civil recoveries.  Victims grant ACCJ powers of attorney to allow ACCJ to carry out its obligations under the Claimant Agreement.  The Victims agree, in the event of a successful recovery, to reimburse ACCJ its costs and to donate 20% of the net recovery to ACCJ.

Although not entirely clear, Ambush and ACCJ had a relationship whereby Ambush would represent Victims who had entered into Claimant Agreements, apparently at the request of ACCJ, and also represented other similarly situated individuals who had not signed a Claimant Agreement.  Other than the Settlement Agreement, no written contract that defined Ambush's relationship with ACCJ was presented to the Court.

In this vein, Ambush represented Victims as plaintiffs, some of whom were parties to Claimant Agreements, in the case of <u>Vega-Franqui, et al. v. Syrian Arab Republic, et al.</u> (the "Franqui Action").  Disputes arose between ACCJ and Ambush that culminated in a lawsuit filed by ACCJ against Ambush in the United States District Court for the District of Columbia (the "2009 Action").  In the 2009 Action, ACCJ alleged that Ambush deceptively convinced the Victims/Plaintiffs in the Franqui Action to revoke powers of attorney with ACCJ and to sign retainer agreements with Ambush.  In the new retainer agreements, the Victims/Plaintiffs agreed to pay Ambush an additional 10% legal fee above the 20% donation payable to ACCJ pursuant to the Claimant Agreements.

ACCJ and Ambush settled the 2009 Action in 2012 via the Settlement Agreement, essentially agreeing to terminate their relationship, to the extent it still existed.  Going forward, the parties agreed not to disparage each other or interfere with client relationships.  To understand the Settlement Agreement and Ambush's claims herein, a recitation of the state of affairs before and soon after the settlement is necessary.

**<u>Pre-Settlement</u>**

After the inception of the 2009 Action, Dr. Michael Engelberg ("Engelberg"), a director of ACCJ, met with Javier Lopez-Perez, Esq. ("Lopez-Perez"), another attorney, like Ambush,

whom ACCJ utilized in its cases.  Ex. D16[2].  According to Lopez-Perez, Engelberg suggested

that he place an advertisement in a local newspaper offering help and services to anyone affected

by Ambush's deception as alleged by ACCJ in the 2009 Action.  Ex. D1, Lopez-Perez Dep. at

15:15-23.  ACCJ paid for the advertisement.  Id.  In addition, at ACCJ's direction, Lopez-Perez

published a newspaper article critical of Ambush.  Ex. D17, Ex. D38.  Lopez-Perez kept

Engelberg apprised of the aftereffect of the article and advertisement.  Ex. D21, Ex. D38.

On January 25, 2010, Lopez-Perez, representing members of the estates of Angel

Berganzo-Colon and Antonio Rodriguez-Morales (the "Berganzo Plaintiffs"), all of whom were

plaintiffs represented by Ambush in the Franqui Action, sued Ambush in the United States

District Court for the District of Puerto Rico (the "Berganzo Action").  Ex. D41, Ex. D42.  The

Berganzo Plaintiffs sought recovery of $2 million in attorney's fees that had been paid to

Ambush.  Lopez-Perez provided Eli Perr ("Perr"), another director of ACCJ, with a copy of the

complaint in advance of its filing.  Ex. D40.  Prior to the filing of the Berganzo Action, Lopez-

Perez was in contact with ACCJ's attorneys in the 2009 Action regarding the intervention of the

Berganzo Plaintiffs in the 2009 Action.  Ex. D19.  No additional context regarding the nature of

the intervention has been presented.

It is unclear whether Lopez-Perez had retainer agreements directly with the Berganzo

Plaintiffs.  The parties presented no written document that outlined the relationship between

ACCJ and Lopez-Perez, though other documents make reference to a "fee arrangement" between

the parties.  Ex. D12.  A few months after filing the Berganzo Action, and apparently unhappy

---

[2] Citations referring to "Ex. D_" referencing those exhibits appended to Ambush's "Supplemental Memorandum of Law in Further Support of Joshua M. Ambush's Cross-Motion for Partial Summary Judgment Against American Center for Civil Justice, Inc." at ECF Docket No. 49.  Exhibits referencing deposition testimony will additionally identify the deponent and deposition page number(s) and lines ("**Ex. D1, Lopez-Perez Dep. at 1:1-2:1**").

with his treatment by ACCJ, Lopez-Perez filed a motion to withdraw as counsel.  Ex. D41.  That

motion was granted in the summer of 2010.  Id.

On September 24, 2010, David Efron, Esq. ("Efron") filed a notice of appearance on

behalf of the Berganzo Plaintiffs.  Id.  Efron testified at deposition that Engelberg contacted him

and asked him to represent the Berganzo Plaintiffs in the Berganzo Action.  Ex. D4, Efron Dep.

at 11:15-12:2.  The record indicates that Efron entered into retainer agreements directly with the

Berganzo Plaintiffs.  Ex. D12.  It does not appear that Efron had a written agreement with ACCJ.

In 2011, the Berganzo Action proceeded to a trial by jury.  Ex. D41.  Dr. Engelberg was

among the witnesses who testified.  On October 4, 2011, the jury returned a verdict against

Ambush based on a finding that he had secured his clients' consent to the new retainer

agreements by deceit.  The trial court entered judgment nullifying Ambush's retainer agreements

and ordered him to pay $1 million to each of the two Berganzo Plaintiffs (the "$2M Judgment").

Ambush appealed the $2M Judgment in February 2012.  Id.  Efron continued to notify

ACCJ of the case's progress.  For example, Efron's office forwarded a copy of Ambush's

Opening Brief in the appeal to Neal Sher ("Sher"), general counsel for ACCJ.  Ex. D46.  At

Sher's request, Efron also forwarded a copy of the reply filed on behalf of the Berganzo

Plaintiffs.  Id., Ex. D47.  Ultimately, the $2M Judgment against Ambush was affirmed in January

2013.  Ex. D41.

Around the same time the Berganzo Action was proceeding, another group of

Victims/Plaintiffs in the Franqui Action, members of the Guzman Estate, also became involved

in litigation in Puerto Rico.  That lawsuit, filed in the Commonwealth of Puerto Rico, Court of

First Instance, Superior Court, Bayamon Division, sought a determination of the distribution of

$10 million in damages awarded in the Franqui Action to the Guzman Estate (the "Domenech

Action").  Some, but not all of the distributees of the Guzman estate were parties to a Claimant

Agreement.

By Partial Judgment of August 31, 2012, the court in the Domenech Action adopted a

Stipulation ordering distribution to the members of the Guzman Estate of all monies to which

ACCJ had no claim, that is, 80% of the $10 million, except in the case of a minor who was

allowed 100% of his claim.  As to the remaining 20% or $2,000,000.00, the Court: (a) awarded

to ACCJ $1,107,142.86, which equaled the donations due to it from those members of the

Guzman Estate who had signed Claimant Agreements (excluding the minor).  The balance of

$857,142.86, which represented the 20% pledge participation of those members of the Guzman

Estate who had not signed Claimant Agreements, was ordered to be retained *in custodia legis*.

The amounts awarded to ACCJ by the Partial Judgment (less the payments ordered) were not

immediately distributed to ACCJ because Efron had asserted his own claim to a portion of the

fees awarded to ACCJ.  A dispute between ACCJ and Efron over payment of fees ensued.

### Settlement Agreement

A few weeks after entry of the Partial Judgment in the Domenech Action in Puerto Rico,

Ambush and ACCJ agreed to settle the 2009 Action and entered into the Settlement Agreement.

Ex. D8.  In relevant part, the Settlement Agreement states that the parties desire to "settle all

claims or controversies between them arising from or related to the subject matter of [the 2009

Action] or the Franqui Litigation."  Id.  Through the Settlement Agreement, the parties agreed to

equally split $1,960,000.00 that Ambush had been ordered to pay into the Registry of the

U.S.D.C. for the District of Columbia.  Id.  The Settlement Agreement contains mutual releases

of any and all claims that "that arises from or relates to the subject matter of the Litigation or the

Franqui Litigation.  Id. at ¶¶ 3-4.  Further, the Settlement Agreement states:

6. Neither Ambush, on the one hand, or the Center, Dr. Engelberg, or Perr, on the other hand, nor any person or entity acting with their knowledge or under their direction or control, shall encourage, sponsor, initiate, finance, including, but not limited to, the payment of attorneys' fees or costs, any form of claim or litigation against the other arising out of or related to the subject matter of the Litigation or the Franqui Litigation or the services performed by any of the Parties in connection with the Franqui Litigation or the administrative claims of any of the plaintiffs in the Franqui Litigation after that Litigation was dismissed.  In the event of any breach of this provision, the non-breaching Party shall be entitled to recover from the breaching Party liquidated damages in the amount of $600,000 plus reasonable attorneys' fees and expenses incurred in enforcing the remedy provided for under this Paragraph 6.  Any action to enforce the remedy provided under this Paragraph 6 shall be filed in the United States District Court for the District of Columbia (the "Court") and shall include the request that the case be assigned to the judge of that Court who presided over the Litigation.  The Parties consent to the exercise of jurisdiction over them by the Court in any such proceeding filed to enforce the remedy provided under this Paragraph 6.

Ambush alleges that ACCJ breached paragraph 6 of the settlement Agreement on five occasions, as described below, entitling him to the liquidated damages set forth therein.

### **Breach #1- Berganzo Motion to Intervene**

Before the ink was dry on the Settlement Agreement, Efron, on behalf of the Berganzo Plaintiffs, filed a motion to intervene in the 2009 Action. Ex. D22.  Through the motion, Efron sought an injunction in the form of a stay of the disbursement of funds to Ambush.  Efron sought to garnish the funds Ambush would receive under the Settlement Agreement to satisfy the $2M Judgment Efron had obtained against Ambush on behalf of the Berganzo Plaintiffs.  Ambush alleges that Efron took this action at the direction of ACCJ and while operating under the direction or control of ACCJ and with their knowledge, a clear violation of the Settlement Agreement.

### Breach #2- Initiation of Vivas-Ruiz v. Ambush

On December 26, 2012, less than four months after the Settlement Agreement was signed, Efron filed a complaint against Ambush on behalf of Ruben Vivas-Ruiz ("Vivas-Ruiz"), another of the Victims/Plaintiffs in the Franqui Action, asserting claims similar to those Efron had successfully asserted for the Berganzo Plaintiffs.  Ex. D23, Ex. D24.  Ambush alleges that Efron took this action at the direction of ACCJ and while operating under the direction or control of ACCJ and with their knowledge, another clear violation of the Settlement Agreement.

### Breach #3- Video Production/Publication

In January 2013, Efron worked with Steve Murphy, a producer, and his media company, Insider Executive, to make a video that painted Ambush as a fraudster.  Ex. D55, Ex. D56. According to Ambush, Efron used the video to find more clients willing to bring additional claims against Ambush.  Ambush alleges that Efron took this action at the direction and with the assistance of ACCJ and while operating under the direction or control of ACCJ and with their knowledge, a third clear violation of the Settlement Agreement.

### Breaches #4 & 5- Domenech Action

Also in early 2013, Ambush moved to intervene in the Domenech Action, which triggered two actions taken by ACCJ that Ambush identifies as separate breaches of the settlement Agreement.  In his motion to intervene, Ambush sought payment of attorneys' fees he claimed were owed to him by certain of his former clients who were distributees of the Guzman Estate and were now parties in the Domenech Action.  On June 10, 2013, ACCJ objected to Ambush's intervention motion (Breach #4).  Ex. D26.  On September 4, 2013, before the court in the Domenech Action ruled on the motion to intervene, ACCJ filed a motion seeking an affirmative ruling that Ambush was not entitled to attorneys' fees, even if he were allowed to

intervene (Breach #5).  Ex. D27.  Ambush alleges that these actions, taken by ACCJ directly,

were clear violations of the Settlement Agreement.  In further support of his position, Ambush

notes that Efron, who was in an adversarial position to ACCJ with relation to the escrowed fees

in the Domenech action, took no position as to Ambush's intervention or claim to fees.  If Efron

were truly interested in protecting his clients, argues Ambush, he would have objected to any

claim that could reduce the amounts available for payment to his clients.

## LEGAL STANDARD

This matter presents as a Partial Motion for Summary Judgment.  Summary judgment is

appropriate where "the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (made applicable to

adversary proceedings pursuant to F.R.B.P. 7056).  Here, the Court recognizes well-defined

disputes between ACCJ and Ambush as to facts material to allowance the Claim.  In this

situation, the Court would typically deny summary judgment and schedule a trial in order to

assess the credibility of witnesses.  But ACCJ and Ambush have tasked this Court with fixing the

Claim by relying on deposition transcripts to support their analysis and have agreed to leave it to

the Court to determine the credibility of the deponents without the benefit of live testimony.

Application of the standard for summary judgment is not appropriate.

The Court will employ traditional claims analysis to reach its decision.  Section 502 of

the Bankruptcy Code controls the allowance of claims or interests in bankruptcy.  *See* 11 U.S.C.

502.  Federal Rule of Bankruptcy Procedure 3001(f) provides that a properly filed claim

constitutes prima facie evidence of the validity and amount of the claim.  Fed. R. Bankr. P.

3001(f).  An objection to a proof of claim may shift the burden of proof.  *See* United States v.

Baskin and Sears, P.C., 207 B.R. 84, 86 (E.D. Pa. 1997).  This is concisely summarized as follows:

> A claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward.  The burden of going forward then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim. It is often said that the objector must produce evidence equal in force to the prima facie case.  In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.  If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.

In re Graboyes, 371 B.R. 113, 119 (E.D. Pa. 2007), *citing*, In re Allegheny Int'l, Inc., 954 F.2d 167, 173-4 (3d Cir. 1992) (citations omitted), In re Gimelson, 2004 U.S. Dist. LEXIS 23879, 2004 WL 2713059 at *13 (E.D. Pa. 2004), In re Galloway, 220 B.R. 236, 244 (Bankr. E.D. Pa. 1998).  "A bald assertion, a mere conclusory statement, is, in and of itself, insufficient to rebut the presumption of validity."  In re Hollars, 198 B.R. 270, 271 (Bankr. S.D. Ohio 1996).

## ANALYSIS

To begin, the Claim itself tests the assumption made by the Bankruptcy Rules that its filing is prima facie proof of its validity and amount.  The Claim exceeds $31 Million.  Ambush has never been able to prove even the hint of liability on the part of ACCJ that approaches that number.  The adversary complaint, as an objection to the Claim, raised more than enough questions about the Claim to shift the burden of proof back to Ambush.  The Court finds he has failed to meet his burden.

The breaches of the Settlement Agreement alleged by Ambush can be broken down into two categories: first, the three beaches involving Efron and second, the breaches made directly by ACCJ in the Domenech Action.

**Efron Actions**

As to the first category, Ambush's theories are based on the belief that, while ACCJ agreed not to interfere with his law practice, reputation and ability to collect fees, ACCJ continued to harass him through Efron.  Ambush alleges that ACCJ directed Efron's actions in the same way ACCJ had directed the actions of Efron's predecessor, Lopez-Perez.  The parties submitted transcripts of the depositions of Efron and Lopez-Perez.

**Breach #1- Berganzo Motion to Intervene**

It is clear that the Berganzo Motion to Intervene filed by Efron was a form of claim or litigation against Ambush which arose out of the subject matter of the 2009 Action and the Franqui Litigation or the services performed by Ambush in connection with the Franqui Litigation.  This would satisfy the requirements for a breach of the Settlement Agreement but for the issue of ACCJ's direction or control of Efron or knowledge of the filings.  Ambush is unable to prove this element.

Reviewing the transcript of the deposition of Lopez-Perez, it is apparent to the Court that Lopez-Perez did ACCJ's bidding during the inception of the Berganzo Action.  He testified that ACCJ contacted him for help in suing Ambush because Ambush was embezzling money from Victims who had signed Claimant Agreements with ACCJ by charging them additional sums for legal work that ACCJ had promised would be limited to 20% of recoveries.  Ex. D1, Lopez-Perez Dep. at 11:16-13:14.  ACCJ paid for advertisements posted by Lopez-Perez at ACCJ's instruction to find clients of Ambush who would be willing to sue Ambush for fees.  Id. at 14:12-15:18.  Engelberg asked to meet with the potential clients.  Id. at 24:23-25:7.  ACCJ demanded to be kept informed as to potential interest by Victims in a lawsuit against Ambush.  He testified to receiving "an average of 15 to 20 calls per day every day of the month that I had a relationship with the ACCJ."  Id. at 18:19-25.  He "had to email them like 25 or 30 times a day."  Id.  The

drafted complaint was based upon facts that had been presented by Engelberg and Perr, without independent investigation.  Id. at 31:11-19.  It is unclear if the Berganzo Plaintiffs had any input in the complaint.  Lopez-Perez testified that he was ACCJ's agent in Puerto Rico.  Id. at 20:7-8.

Importantly, the only compensation Lopez-Perez received for his efforts was paid to him directly by ACCJ, not the Berganzo Plaintiffs.  Id. at 17:10-18:18; 19:14-20:8.  Lopez-Perez did not have a retainer agreement with ACCJ, nor did he have a retainer agreement with the Berganzo Plaintiffs.  Id. at 39:9-18; 41:3-5.

Lopez-Perez became dissatisfied with his relationship with ACCJ.  He testified that he was actively working on claims for ACCJ, but ACCJ was not paying him.  P. 40:25-41:2.  He testified:

> "[a]gain, I was not being adequately compensated, if at all, at the end. I don't think I was compensated for like the past -- the four months prior to me leaving or probably six months.  It took eight hours a day working with the claims that I did file, phone calls, emails. And I said wait a minute. I filed the claims. They know I'm doing the work. I was involved in other cases.  So when I received seven calls from Engelberg in the course of one hour while I was probably in court or dealing with another matter, I wouldn't answer them.  And they didn't like that at all. They didn't like that at all. That's how we started getting a little bit sour there."

Id. at 34:20-35:8.  The relationship between Lopez-Perez and ACCJ ended in the summer of 2010, more than two years before Ambush and ACCJ signed the Settlement Agreement.  At that time, the Berganzo Action against Ambush for recovery of fees was well underway.

Efron substituted in for Lopez-Perez in that litigation and prosecuted it to judgment before the Settlement Agreement was signed.  Efron was not a party to the Settlement Agreement.  A review the transcript of his deposition paints an entirely different picture of his relationship with ACCJ than that of ACCJ's relationship with Lopez-Perez.  Efron testified that ACCJ referred the Berganzo Plaintiffs to him to replace Lopez-Perez as their attorney.  Ex. D4,

Efron Dep. at 11:23-12:25.  He had no prior relationship with ACCJ.  Id.  He had retainer

agreements with the Berganzo Plaintiffs, Id. at 15:1-17, and was never retained by ACCJ "as

their lawyer, employee, or independent contractor." Id. at 19:6-17.  He was compensated directly

by his clients.  Id. at 24:1-10.  He made no contribution to ACCJ from the monies he received.

Id. at 24:11-13.  He testified that ACCJ never encouraged him to pursue Ambush on behalf of

the Berganzo Plaintiffs, stating, "I didn't need any encouragement.  I filed a case, and I tried it."

Id. at 22:7-13.  He did not keep ACCJ apprised of the progress of the case, though he was in

contact with Engelberg only to the extent Engelberg was needed as a witness in the case.  Id. at

22:14-17.  Efron testified that he did not actively pursue clients to sue Ambush.  Id. at 33:22-25.

        This Court finds that Ambush failed to meet his burden of proving that Efron acted under

the "direction or control" of ACCJ.  Ambush bases his theory of "direction or control" upon a

belief that ACCJ served as a "puppet master" of Efron.  He references five (5) factors in support

of this theory:  (1) communication between Lopez-Perez and ACCJ's counsel in the 2009

Action; (2) communications between Efron and ACCJ; (3) ACCJ and Efron's ongoing

relationship that extended post-settlement, made evident by, *inter alia*, Efron's pursuit of other

related matters for ACCJ's benefit; (4) Efron's transmission of documents to ACCJ related to the

Berganzo Action within a month of the execution of the Settlement Agreement and two months

of the filing of the Berganzo Motion; and (5) a look at ACCJ's relationship with Efron's

predecessor, Lopez-Perez.

        Ambush claims ACCJ selected and engaged Efron to take over representation of the

Berganzo Plaintiffs, and Efron filed the Berganzo Motion in furtherance of that relationship.

The theory that ACCJ had "direction or control" over Efron as to the Berganzo Action is

unavailing.  The position is largely premised upon the fact that because Lopez-Perez was

directed and controlled by ACCJ, Efron, as the substituting attorney, must have also been

directed and controlled by them.  But, neither the testimony nor the documentary evidence

supports such a finding.  Efron and ACCJ had no relationship prior to the Berganzo Action.

Efron's testimony is consistent that he acted on behalf of his clients and not ACCJ.  The

documentary evidence consists of little more than e-mails between Efron and ACCJ in which the

parties requested and sent docketed filings in the appeal.  It is without question that the parties

had a relationship.  However, the transmission of a public record as a courtesy between those

parties is of no persuasive value in this matter.

Additionally, that Efron and ACCJ had a relationship beyond the Berganzo Action is of

minimal value.  That relationship was complicated and messy.  In fact, its relationship with Efron

was adversarial at the time the Settlement Agreement was signed.  An August 22, 2012 letter

from Efron to Sher references an ongoing fee dispute between Efron and ACCJ mere weeks

before the Settlement Agreement was signed.  *See* ECF 56 at Ex. A.  It is clear from the letter

that Efron is unhappy with ACCJ.  Ambush argues that a fee dispute in one matter does not mean

Efron would not continue to pursue ACCJ's interests in other matters.  The Court agrees that this

may often be the case in professional relationships but finds it does not apply here.  Indeed, this

fee dispute was not the only acrimony between Efron and ACCJ.

Efron's motion to intervene in the 2009 Action caused friction between Efron and ACCJ.

By Memorandum Opinion and Order dated October 4, 2012, the court in the 2009 Action

dismissed Efron's motion as moot since the funds had already been disbursed to Ambush.  *See*

ECF 56 at Ex. B.  Efron then sent a letter responding to another attorney who he claimed

"worked for" ACCJ.  *See* ECF 56 at Ex. C.  In it, Efron expressed his displeasure that ACCJ had

not informed him of the distribution that was made to Ambush pursuant to the Settlement

Agreement, thereby preventing him from garnishing Ambush's portion of the settlement on

behalf of the Berganzo Plaintiffs. Efron relayed that his clients, the Berganzo Plaintiffs, felt

betrayed by ACCJ. While Efron's lack of success in garnishing the payment made to Ambush is

not a determinative factor as to whether Efron's filing of the motion itself was a breach, it makes

little sense that ACCJ would direct or control Efron to file an untimely motion. ACCJ knew of

the timing of the distribution to Ambush. If ACCJ intended for Efron to interfere with the

distribution, ACCJ would have acted sooner.

Ultimately, Ambush's focus on the relationship between ACCJ and Efron is, in some

part, a slight of hand. It serves to shift the focus from the reality of the situation. There were

third parties who were defrauded by Ambush. Those parties obtained a judgment and were

entitled to use whatever means necessary to collect it. Efron's actions were based upon his

professional and ethical duty to and relationship with those parties as their attorney.

The most persuasive evidence that Ambush presents with respect to the "puppet master"

theory is the fact that intervention in the 2009 Action appears to have been contemplated before

the Berganzo Action was even filed. Ambush has provided a January 6, 2010 e-mail from

Lopez-Perez to ACCJ's counsel in the 2009 Action which apparently references certain of the

plaintiffs from the yet-unfiled Berganzo Action who sought to intervene in the 2009 Action. Ex.

D19. While it is intriguing that Lopez-Perez, who appeared to be under the direction or control

of ACCJ, referenced intervention in the 2009 Action, there is no context given to the relatively

short e-mail exchange. Additionally, the fact that there was prior talk of intervention does not

support a finding that Efron was directed to do so. Efron was involved in the case for

approximately 2 years before he, not Lopez-Perez, filed the intervention motion. By the time the

motion was filed, Efron had obtained the $2M Judgment upon which his clients would have

rightfully sought to collect.  To the extent Efron knew that intervention had been discussed in the

past, that did not prevent him from filing a similar motion if, in his professional opinion, it

represented the most effective way to collect on the judgment.

There is no smoking gun.  Efron had a duty to his clients.  ACCJ had no control over that

relationship.  Theorizing that ACCJ could control or direct Efron to take actions that would

adversely affect those parties is not reasonable.  More importantly, it is completely unsupported

by the record.

But the Settlement Agreement, argues Ambush, goes beyond imposing liability on ACCJ

for persons acting under its direction or control.  Ambush, applying a strict reading of paragraph

6 of the Settlement Agreement, argues that if ACCJ had "knowledge" of actions taken by Efron

in contravention of the provisions of the Settlement Agreement, ACCJ would be in breach of the

Settlement Agreement.  Paragraph 6 begins:

> Neither Ambush, on the one hand, or [ACCJ], Dr. Engelberg, or Perr, on the other hand,
> *nor any person or entity acting with their knowledge* or under their control, shall
> encourage, sponsor…

(emphasis added).  Ambush argues that ACCJ's <u>knowledge</u> of the filing gives rise to a breach.

He advances several positions in support of this allegation.  First, he alleges that ACCJ must

have had advance notice due to its relationship with Efron.  There is no evidence to support this

theory.  The Court interprets the evidence submitted to describe the relationship between Efron

and ACCJ as supporting the conclusion that it is not likely ACCJ would have had advance notice

of Efron's attempt to garnish the distribution to Ambush.  If ACCJ had advance knowledge of

Efron's intention to interfere with the payment to Ambush of the amount due to him under the

Settlement Agreement, it is logical ACCJ would have informed Efron that the funds had left the

Court registry, making Efron's motion moot.

Second, Ambush argues that the Settlement Agreement does not require "knowledge in advance," only simple "knowledge."  Therefore, once the motion was filed, ACCJ had knowledge.  ACCJ's failure to stop Efron was the breach.  Under either position, Ambush's interpretation of the language of paragraph 6 is nonsensical.  Applying his literal interpretation could impose liability on ACCJ if they knew before <u>or</u> learned after that "any person or entity" took action against Ambush, regardless of ACCJ's relationship with that person or entity.  The Court finds the only logical interpretation of the language must include the entire phrase.  "Any person or entity acting with [ACCJ's] knowledge" must be informed and tempered by the rest of the phrase: "or under [ACCJ's] direction or control."  Any other reading leads to absurd results.

Ambush's final position in support of ACCJ's breach is that the reference to "knowledge" in the Settlement Agreement imposed upon ACCJ an obligation to inform persons or entities with which ACCJ had a relationship of the existence of the Settlement Agreement and of ACCJ's obligations thereunder.  There is no dispute that ACCJ did not do so.

The Court rejects Ambush's interpretation of the Settlement Agreement.  The Settlement Agreement contained no affirmative duty to inform other parties.  Efron did not sign the Settlement Agreement.  He had his own obligations to his clients that could not be affected by the Settlement Agreement.  Even if ACCJ had told Efron of the promises it made in the Settlement Agreement, Efron had a professional duty to his clients to pursue collection of the judgment he had obtained against Ambush.

The Court notes that Efron obtained the $2 Million judgment against Ambush on behalf of the Berganzo Plaintiffs long before the Settlement Agreement was signed.  In fact, Ambush had appealed that judgment and had not received a decision at the time he signed the Settlement

Agreement.  Yet the Settlement Agreement did not address the $2M Judgment, its appeal, or any actions Efron may take to validate or enforce it.

This is not to say that ACCJ is an "innocent" actor.  When it began the 2009 Action, ACCJ filed a request for preliminary injunction against Ambush.  *See* Ex. D34.  At the hearing on ACCJ's request, the court noted that it had serious concerns about ACCJ's standing to pursue Ambush for harm he had allegedly inflicted on Victims.  The court denied the request for a preliminary injunction and the 2009 Action proceeded.  Not long after the hearing, Engelberg contacted Lopez-Perez, who successfully drummed up plaintiffs whose standing to sue Ambush would not be questioned.  So, if ACCJ could not get to Ambush directly, it would get to him indirectly.[3]  But the problem for Ambush is that ACCJ, through Lopez-Perez, recruited the Berganzo Plaintiffs before Ambush negotiated and signed the Settlement Agreement.  The Settlement Agreement put an end to any claims Ambush could have made before it was signed.  To the extent Efron's actions could have been addressed in the Settlement Agreement (and this Court finds it difficult to understand how they could have been addressed), the fact is that they were not addressed.  The proofs fall far short of establishing ACCJ's direction or control of Efron.

For these reasons, Ambush has failed to establish a breach caused by Efron's filing of a motion to intervene in the 2009 Action on behalf of the Berganzo Plaintiffs in an attempt to collect on the $2M Judgment.

---

[3] The question of standing raised by the federal court in D.C.  in the 2009 Action informs this Court's understanding of Ambush's argument that ACCJ anticipated Efron's later attempt to intervene in the 2009 Action early on in the proceeding.  The January 6, 2010 email referencing a possible intervention (Ex. D19), likely applied to the possible intervention of the Berganzo Plaintiffs as additional plaintiffs in that action to provide the standing ACCJ lacked, not to Efron's years-later attempt to intervene to prevent Ambush from receiving a distribution under the Settlement Agreement.

### Breach #2- Initiation of Vivas-Ruiz v. Ambush

Similar to the Berganzo Motion to Intervene, it is not in reasonable dispute that the filing of the lawsuit on behalf of Vivas-Ruiz constituted the initiation of litigation against Ambush which related to the Franqui Litigation.  And the Court follows much of the same analysis in determining that while those elements of a breach under the Settlement Agreement have been met, there has not been a showing that Efron was acting under the direction or control or with the knowledge of ACCJ.

At his deposition, Efron explained that Vivas-Ruiz was supposed to be included as a plaintiff in the claim against Ambush that was originally filed by Lopez-Perez on behalf of the Berganzo Plaintiffs.  Ex. D4, Efron Dep. at 32:25-33:4.  But Vivas-Ruiz did not sign Efron's retainer letter and was not included as a beneficiary of the $2M Judgment obtained by Efron on behalf of the Berganzo Plaintiffs.  *See* discussion in id. at 24:14-28:21.  He believed that ACCJ would have assumed Vivas-Ruiz had been included in the original complaint.  Id. at 32:20-33:4.  He testified that he did not recall speaking to ACCJ about filing a claim against Ambush on behalf of Vivas-Ruiz before he filed it.  Id. at 32:8-23.

Efron stated that he filed the complaint on behalf of Vivas-Ruiz, knowing that he may not be successful in light of the statute of limitation, which turned out to be the case.  Id. at 33:14-18.  He testified that he did not recall telling ACCJ of the outcome. Id. at 33:19-21.

With no direct evidence, Ambush again utilizes conjecture to support his belief that a breach of the Settlement Agreement occurred through the filing of the Vivas-Ruiz litigation.  Because ACCJ referred the Berganzo Action to Efron, and because Vivas-Ruiz was one of the Berganzo Plaintiffs who retained Efron, and because the Vivas-Ruiz claim against Ambush stemmed from the same action, albeit filed too late, and because Efron and ACCJ had a

relationship in other cases, Ambush argues ACCJ <u>must have</u> directed Efron to file the second

case against Ambush on behalf of Vivas-Ruiz.  There is no evidentiary basis for this theory.

The Court reads Efron's testimony to support the conclusion that he pursued a recovery

against Ambush on behalf of Vivas-Ruiz on his own, without the involvement of ACCJ.  Vivas-

Ruiz was one of the Berganzo Plaintiffs who decided, too late as it turned out, to hop on the

bandwagon for a recovery against Ambush.  It makes sense to the Court that Efron would try

assist Vivas-Ruiz in doing so.  He had already been successful in obtaining a judgment for the

Berganzo Plaintiffs.  The Court has been given no reason to believe that Efron brought the claim

at ACCJ's urging or with ACCJ's knowledge.

### Breach #3- Video Production/Publication

The video production and publication was not a legal filing, and therefore could not

constitute the initiation of a claim or litigation against Ambush.  In this respect it differed from

alleged Breaches #1 and #2.  However, Ambush theorizes that the purpose of the video was to

<u>encourage</u> the filing of claims or litigation against Ambush.  Regardless of the distinction,

Ambush encounters the same issues in establishing that Efron acted at the behest of ACCJ.

Ambush alleges that ACCJ promoted the production of the video that depicted him as a

dishonest lawyer who took advantage of victims of terror.  In addition to questioning Efron about

the video, Ambush deposed Steve Murphy, who produced the video.  Ex. D2.  Murphy testified

that Efron was the only one who gave him the information necessary to create the video.  Ex. D2,

Murphy Dep. at 11:18-21; 12:22-25.  He had no record of who paid him to produce the video.

<u>Id</u>. at 16:14-17.  He explained that he made two videos for Efron at the same time, one about

Ambush and the other about a medical malpractice case.  <u>Id</u>. at 19:1-5; 26:8-9.  Murphy assumed

Efron would use the videos to advertise his legal services.  <u>Id</u>. at 19:5-9.  He testified that he

never spoke to anyone from ACCJ, neither had he heard of Eli or Jed Perr, Engelberg, Sher, or Lopez-Perez.  Id. at 23:6-23.

While Efron's testimony regarding the making of the video differed in some respects from Murphy's testimony, the differences are not material.  More importantly, Efron testified that he did not discuss the video with any representative of ACCJ.  Id. at 41:18-24.  He admitted that he paid the expenses of production.  The Court sees the video as an attempt by Efron to advertise his legal skills.  This conclusion is further supported by Murphy's testimony that he also made a video highlighting Efron's involvement in malpractice cases, an area in which ACCJ apparently had no interest or connection.  See Id. at 40:9-16.

Ambush is unable to develop anything more than assumptions that ACCJ was somehow involved in producing the video because the attacks on him are similar to those in the advertisement and new article advanced by ACCJ through Lopez-Perez in 2012.  He references a tenuous connection between language in the video, and words used in passing by Perr in a single e-mail to Lopez-Perez from 2009.  This is not sufficient to satisfy the burden of proving that the video was a breach of the Settlement Agreement by ACCJ.

### ACCJ Actions

Turning to the second category of alleged breaches, those actions taken directly by ACCJ against Ambush, Efron continues to be implicated, but indirectly.  The Court finds that Ambush again falls short of proving a breach.

### Breaches #4 & 5- Domenech Action

The basis for Ambush's claims of breaches of the Settlement Agreement as to the Domenech Action are more complicated than those involving Efron and requires some additional factual background.

As was the case with the appeal of the $2 Million Judgment, the Domenech Action was pending at the time the Settlement Agreement was being negotiated and signed.  In fact, the Domenech Action had already progressed to the point where the court had decided the issues raised in connection with the distribution of 80% to the heirs of the Guzman Estate and that distribution had been made.  The only issues remaining in the Domenech Action centered on the rights of ACCJ and Efron to the remaining 20%.  *See* Ex. D50 at n.4-6.

The remaining 20% could further be broken down into two "pots"- the first pot being the $1,107,142.86 consisting of the donations due to ACCJ from those members of the Guzman Estate who had signed Claimant Agreements (excluding the minor) ("Pot One").  This pot was already awarded to ACCJ subject only to Efron's claim for attorney fees.  Ex. D50.  The second pot was the balance of $857,142.86, which represented the 20% pledge participation of those members of the Guzman Estate who had not signed Claimant Agreements, and which had been ordered held *in custodia legis* ("Pot Two").  Pot Two was being held pending a determination as to whether ACCJ or members of the Guzman Estate were entitled to it.

Although Ambush claims it was clear to everyone that he would be seeking fees in the Domenech Action, it is not mentioned anywhere in the Settlement Agreement.  This is curious coming from Ambush, who argues here that the Settlement Agreement should be strictly interpreted.

On April 26, 2013, Ambush moved to intervene in the Domenech Action so that he could assert his entitlement to approximately $1,000,000 in fees from his former clients.  Ambush alleges that he was clear that he wanted a percentage of the funds only from Pot Two that, according to Ambush, ACCJ had no claim to.  This position is confusing, as ACCJ was claiming an entitlement to all the remaining funds.

The court in the Domenech Action docketed a May 16, 2013 notification which set a ten (10) day deadline for filings in regard to Ambush's request to intervene (the "Notification"). Ex. D63.  Shortly thereafter, on May 21, 2013, Ambush filed a motion to stay the proceedings in the Domenech Action, asking the court "not to resolve the pending motions in which the parties seek distribution of the money deposited until the Court makes a determination regarding Ambush's Petition to Intervene"

In June 2013, ACCJ filed what was labeled a "Motion in Compliance with Order."  The "order" referenced was the Notification.  The Motion in Compliance with Order objected to Ambush's request to intervene.  Ambush alleges that ACCJ's filing of the Motion in Compliance with Order forms the basis for Breach #4, in that it interfered with his ability to pursue his legal fees.

ACCJ then filed a separate motion on September 4, 2013, seeking an affirmative ruling that Ambush was not entitled to attorneys' fees. This prayer for relief, separate and apart from the Motion in Compliance with Order, provides the basis for Ambush's claim of a fifth breach of the Settlement Agreement.

Ambush takes the position that ACCJ was not required to respond to the Notification or take any position on his intervention.  He states that the Motion in Compliance with Order served no purpose to ACCJ because Ambush only sought fees separate from and in addition to those sought by ACCJ.  His strategy was apparently to pursue those members of the Guzman Estate who had not signed Claimant Agreements (the "Non-Claimant Agreement Members").  He believed the Non-Claimant Agreement Members could be forced to abide by an agreement that the entirety of the Guzman Estate made with Ambush and thereby pay his fee, in full, with no effect on ACCJ.  This result would apparently force the Non-Claimant Agreement Members to

choose whether or not to pursue contribution or indemnification from those members who did

not pay Ambush.  Ambush's hope was that even if he were unsuccessful in forcing the Non-

Claimant Agreement Members to pay the obligation of the other heirs, a judgment in his favor

would have enabled him to collect his fee without having to initiate a new suit.  In sum, he

claims that the purpose of the Motion Requesting Intervention was simply to establish a forum

for him to assert a claim against his clients.

ACCJ's position is that the Notification required it to take a position on Ambush's

request to intervene.  It states that it made no claim that Ambush was not entitled to the 10% that

he claimed he was owed.  It claims that it was merely trying to protect its own claims to the

money against Ambush, who it alleges was the aggressor in the matter.

Regardless of whether the Notification required a response, it is not clear to the Court

exactly what Ambush was seeking.  At the very least there is the appearance that Ambush was

taking an action that would adversely affect ACCJ.  Ambush states that his motion was just

designed to "get a seat at the table," and was procedural.  He claims that he was not seeking any

distributions.  But ACCJ was claiming an entitlement to all the money in both Pot One and Pot

Two.  Any amount paid to Ambush would decrease the amount available to pay ACCJ.  If

Ambush was truly not seeking any distribution, then there was no purpose in intervening.  The

record does not support Ambush's position that his intervention had no effect on ACCJ.

First, Ambush's filing directly attacked ACCJ's entitlement to Pot Two.  He did not take

the position that if the funds did not belong to ACCJ then he should be entitled to them.  Instead

he advanced the position that ACCJ was not entitled to the funds at all, stating in his filing:

> 52. Lastly, the petition [referring to the Complaint in the case where he
> seeks to intervene] describes the 20% to be paid to the Center as "attorney
> fees".  The Center is not a law firm and its stockholders, directors,

officials, officers and representatives are not attorneys. The Center was never the legal representative of the members of the Guzman Estate. The legal representative of the Guzman Estate was Ambush.

Second, Ambush moved to stay the proceedings until his motion to intervene was determined. This affected ACCJ's rights to both Pot One, over which Ambush agrees he had <u>no</u> claim, and Pot Two. If he only wanted a seat at the table, and not a piece of the pie for himself, such a motion would be unnecessary.

Finally, Ambush references the available monies in relation to his claim as a grounds for intervention, stating:

> Ambush is an attorney requiring 10% of the compensation granted, as agreed, in the form of attorney's fees. There are disputes pending before this Court with respect to compensation for legal representation and there is still 20% of the total of compensation granted deposited in the Court. Due to the fact that the amount that is still deposited in the Court is greater than the 10% requested by Ambush, it is not too late to claim this 10% for attorney's fees.

ECF 55 at Ex. 1. It is difficult to read this language in any other way than as evidence of Ambush's intent to attach his claim to the money deposited in the court. Notably, his claim for $1,000,000 is in excess of the amount in Pot Two. Full satisfaction of his claim could <u>only</u> occur through partial payment of Pot One, a pot to which Ambush had no legitimate claim.

It is reasonable that Ambush saw the opportunity to collect from his former clients through any available funds in the Domenech Action. But ACCJ had claimed an entitlement to the full amount of those funds. Ambush's filings do not demonstrate a "wait and see" approach, but rather the approach of a party who sought to intervene to obtain relief at the expense of ACCJ. For these reasons, this Court views ACCJ's filing of the Motion in Compliance with Order to be defensive in nature, done to protect its own claim to Pot One and Pot Two, and not to

assert any independent claim against Ambush.  Therefore, a violation of the Settlement

Agreement did not occur.

The September 4, 2013 motion filed by ACCJ, which Ambush believes supports Breach

#5, was an extension of the dispute over intervention.  Though Ambush couches it as a "motion

seeking an affirmative ruling that Ambush was not entitled to attorneys' fees," a plain reading of

the document evidences that it was akin to a sur-reply to Ambush's response to the ACCJ

objection to intervention.  ECF 34 at Ex. C.  In fact, the requests for relief contained in the

"motion" do not reference Ambush's attorneys' fees in any way.  Instead, the motion requests

that the court:  "(a) take notice of the foregoing; (b) consider supplemented the position of the

Center with regard to the request for intervention made by Ambush; (c) deny the intervention of

Mr. Ambush in this procedure, and (d) proceed with the adjudication of further disputes

submitted by the parties, before the consideration of the Court."  Id.  There is simply no basis to

find any breach as to this document.

## CONCLUSION

The Court notes that the Second Count of ACCJ's complaint, which it labelled

Counterclaim – Breach of Contract, is not addressed in this decision.  The parties have made

their arguments clear as to the affirmative relief requested by ACCJ in the Second Count, but

ACCJ has not formally requested judgment on that Count.  The parties are ordered to notify the

Court within seven days of the date of this decision if they believe the record needs to be

expanded before the issue of affirmative relief to ACCJ is ripe for this Court's review.


Dated:  March 23, 2020                          /s/Christine M. Gravelle
                                                United States Bankruptcy Judge